# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

**SARABETH WITBART**,

    Plaintiff,

vs.

**MANDARA SPA (HAWAII), LLC,**

    Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, **SARABETH WITBART**, sues Defendant, **MANDARA SPA (HAWAII), LLC,** as follows:

## GENERAL ALLEGATIONS

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00. Furthermore, the Defendant has a forum selection clause in its employment agreement with the Plaintiff mandating suit in this Court.

2. The causes of action asserted in this Complaint arise, respectively, under the Jones Act, 46 U.S.C. § 30104 and the General Maritime Law of the United States.

3. At all times material hereto, Defendant was the Jones Act employer of the Plaintiff.

4. At all times material hereto, the Plaintiff was acting within the course and scope of her employment with Defendant as a seaman, notably a cosmetologist in the spa which Defendant operated aboard the Norwegian Cruise Line's cruise ship vessel *America's Pride of America* – the only cruise ship vessel registered in the United States.

5. Plaintiff's first contract of employment with Defendant was from July 12, 2014, through April 25, 2015.

6. On or about November 18, 2014, Plaintiff complained to the ship's doctor of radiating neck pain she was experiencing, and the doctor told the Plaintiff that an MRI was advisable. However, the ship doctor did not prescribe the MRI and facilitate a medical disembarkation. Instead, the Plaintiff be disembarked for an MRI on her own time. None of this information appears not to have been recorded or saved in the Plaintiff's ship-board medical records.

7. Plaintiff's second contract of employment with Defendant was from July 11, 2015, through February 27, 2016, at which time the vessel on which Plaintiff worked was placed in dry dock, and then continuing from March 11, 2016, through April 9, 2016.

8. In or around September 2015, Plaintiff experienced and complained to the ship doctor of right sided neck pain and was, to her understanding and recollection, diagnosed with a strain.

9. On or about October 20 and 28, 2015, respectively, Plaintiff's right hand swelled, and the ship doctor to whom Plaintiff reported each event gave Plaintiff, to her understanding and recollection, gave her steroids and a splint.

10. Plaintiff's third contract of employment with Defendant was from October 15, 2016, through January 21, 2017, when she was medically disembarked.

11. On or about December 20, 2016, Plaintiff had extreme weakness in her right hand and dropped her tools while working. Plaintiff initially thought she was simply overworked from the holiday season. So she struggled and worked through the pain until she could no longer take it, and saw the ship doctor on or about January 7, 2017.

12. On that date, Plaintiff reported to the senior doctor aboard *The Pride of America*, A. Yasser

El Sergany, M.D., FRCSI, with complaints of pain in my neck which radiated into her shoulder and arms.

13. After conducting an examination, Dr. Sergany wrote Plaintiff a prescription for an MRI to be completed on her cervical neck and notified her manager, Audrey Nichols, on or about January 12, 2017, that Plaintiff's conditions was work-related and that the MRI was a necessary diagnostic test.

14. The MRI was done on or about January 16, 2017. Upon receiving the results of the MRI, Dr. Sergany notified Defendant that Plaintiff was no longer fit for duty which resulted in her disembarkation from the ship on or about Saturday, January 21, 2017, to return to the mainland United States for medical treatment.

15. Defendant delegates the non-delegable responsibilities of making prompt and adequate provision of maintenance and cure to a related company, Steiner Transocean Ltd, located in Coral Gables, Florida.

16. Keara Goldblatt of Steiner advised Plaintiff that Steiner had to authorize all medical care or treatment and the cost of same before the care or treatment was rendered, and Steiner would pay the cost of the care or treatment if the care or treatment was not covered by Plaintiff's healthcare insurance plan, UHA.

17. Steiner also mandated that Plaintiff provide Steiner the reports from the healthcare providers who were providing her treatment or care.

18. Plaintiff at all times material provided Steiner information on the nature of the care or treatment she was recommended to receive and the dollar amounts of same for Steiner to authorize.

19. Plaintiff at all times material provided Steiner the reports from the healthcare providers who

were providing her treatment or care.

20. On or about February 20, 2017, Plaintiff saw Neurosurgeon Dr. Wilson Z. Ray of Washington University Hospital, who, among other things, read Plaintiff's cervical MRI and ordered eight to 12 weeks of physical therapy.

21. Plaintiff received physical therapy from on or about February 24, 2017, through on or about April 14, 2017, the last day prescribed.

22. On or about April 13, 2017, Plaintiff sought via e-mail approval from Iliana Cabrera of Steiner for eight to 12 more weeks of physical therapy at two times per week, as prescribed by Plaintiff's treating physician.

23. On or about April 17, 2017, Iliana Cabrera e-mailed Plaintiff back asking Plaintiff to provide an estimate of the physical therapy treatments.

24. Plaintiff and Defendant split the payment of premiums of Plaintiff's UHA healthcare insurance plan during the time Plaintiff was aboard the ship. However, on or about April 30, 2017, Defendant ceased paying its share of the premiums for the UHA health insurance, allowed the policy to lapse, and required Plaintiff to pay the entire $430.00 monthly cost of COBRA for the UHA plan.

25. E-mails between Cabrera and Plaintiff concerning physical therapy and COBRA were sent and received on May1, 2, 3, 6, and 8, 2017.

26. It was not until 26 days elapsed from when Plaintiff's treating physician prescribed the additional therapy that Plaintiff was permitted to begin the therapy.

27. Plaintiff's last day of physical therapy from that second prescription for same was June 26, 2017.

28. On or about July 3, 2017, Plaintiff had a follow up appointment with Dr. Ray. He ordered an

additional eight – 12 more weeks of physical therapy twice weekly.

29. Plaintiff e-mailed Dr. Ray's report immediately after her receipt of same, on or about July 18, 2017, to Cabrera at Steiner.

30. On or about August 1, 2017, Plaintiff e-mailed to Steiner that UHA insurance was denying the additional physical therapy per Plaintiff's telephone call with the UHA representative. UHA's decision to cover or not cover any care or treatment under the terms of its health insurance policy is, as Defendant well knows, of no legal relevance to Defendant's obligation, but Defendant ostensibly relied on that denial in refusing to make provision of the additional therapy.

31. On or about August 8, 2017, Plaintiff saw Dr. Lesley Rao, M.D., who prescribed steroidal injections.

32. Plaintiff submitted Dr. Rao's prescription and report immediately to Steiner. However, Steiner took about four weeks to approve the treatment. As a consequence of Steiner's delay, Plaintiff did not get her injection until September 16, 2017.

33. On or about September 22, 2017, Plaintiff received a telephone call from Elizabeth Junco of Steiner with respect to the aforesaid refusal of additional physical therapy, and this call led to a decision from Steiner that it would pay for the therapy, but only at a lesser price than earlier submitted by the therapy facility.

34. Dr. Ray, meanwhile, wanted Plaintiff to have physical therapy immediately after the steroid injections, and Plaintiff provided Steiner Dr. Ray's report in that regard.

35. But this is the response Iliana Cabera from Steiner sent Plaintiff on or about September 28, 2017 from Iliana Cabrera, a full 15 days after Plaintiff's injections:

> *Thank you for sending your new estimate for your physical therapy treatment which we note is $256.50 per session.*
>
> *Steiner will cover up to $75.00 per session 2 x a week. You are more than welcome to continue your PT at Sparta and pay the difference. Otherwise, we will be more than happy to assist you in looking for a different physical therapy facility.*

36. Plaintiff could not, obviously, pay the costs of therapy inasmuch as Steiner was paying her a measly $25 per day in maintenance and obligating her to pay $430 for COBRA.

37. Plaintiff thus sent the following email two times:

> *From: Sarabeth Witbart <sbwitbart@icloud.com>*
> *Date: November 6, 2017 at 2:39:03 PM CST*
> *To: IlianaC@steinerleisure.com*
> *Subject: Sarabeth Witbart POA*
>
> *Dear Ms. Cabrera*
>
> *I have attached my email that was sent on Oct 27,2017. In hopes that I will get a response soon.*
>
>> *Dear Ms. Cabrera*
>>
>> *In response to your recent email I reiterate once again according to my contract #4 under Benefits it states*
>>
>> *"Should an employee suffer a work related injury such that employee is not fit for duty the company will provide maintenance and cure for the employee so long as employee remains unfit for duty or until employee reaches maximum medical cure".*
>>
>> *As you are aware my doctor says I have not reached my maximum medical cure.*
>>
>> *Therefore, as I am still in need of physical therapy, it appears to me you are responsible to pay for the cost of my therapy sessions. Earning $25 a day paying $430 out for insurance per month allows me no money with which to obtain physical therapy, nor should it be my obligation.*
>>
>> *If you can find a therapist within 30 miles of my location at a cost of $150 per therapy session (McKenzie certified), I would be willing to travel. If not, I believe you are required to pay.*

> *Due to your continual delay my injury and symptoms may be being aggravated. As you should recall from my letter from my doctor he has stated that I am not fit for duty and needed this therapy treatment.*
>
> *Thank you*
> *Sarabeth Witbart*

38. Since Plaintiff was getting nowhere fast, on or about September 27, 2017, Plaintiff attempted to file a *pro per* Longshoreman's Complaint against Defendant because her lay research led her to mistakenly believe that she could seek redress in that manner.

39. The Longshoremen's legal office later aptly advised Plaintiff that she did not qualify for such benefits, so Plaintiff did not pursue the matter further.

40. One would think that the Complaint would have impelled Defendant to make provision of prompt and adequate maintenance and cure, but it did not.

41. On or about November 14, 2017, Plaintiff had a rather lengthy telephone conversation with Ms. Junco. Junco refused to pay for any additional physical therapy because "all [Plaintiff had] is a bone spur," and additional physical therapy would be useless and simply palliative. Junco then asked Plaintiff to seek a second opinion and tried to intimidate Plaintiff into seeing an orthopedist.

42. Plaintiff thereafter spoke with her general practitioner who confirmed to Plaintiff that she did not have a mere orthopedic issue and advised her to see another neurosurgeon as opposed to a basic orthopedic doctor as Junco had urged. Plaintiff thereafter informed Junco of this fact.

43. On or about December 19, 2017, Plaintiff saw Dr. Paul Young, M.D., a second neurosurgeon who agreed with Dr. Ray that the best hope to avoid spinal surgery would be long-term physical therapy. And this physical therapy was curative, not simply palliative.

44. On or about January 10, 2018, Plaintiff Dr. Young's medical report and e-mailed it that same

day to both Elizabeth Junco and Iliana Cabrera.

45. Junco did not respond. Indeed, Junco took the ridiculous position that she would no longer communicate with Plaintiff about her medical care or treatment via e-mail; Junco would, she told Plaintiff, only communicate with Plaintiff by telephone. This despite the facts that Plaintiff had communicated by e-mail with Steiner for many months up that that point, and that Plaintiff had informed Junco that Plaintiff's phone was unreliable.

46. On or about January 10, 15, 23, 25 and 26 of 2018, Plaintiff had attempted without success to contact Ms. Junco or Ms. Cabrera to obtain a response to their requested second opinion provided in the medical record from Dr. Paul Young.

47. Shortly thereafter, Plaintiff retained attorney Gerald McGill who, in turn, wrote a letter to Junco in which he fundamentally asked the long-time Steiner employee why she was denying Plaintiff needed maintenance and cure.

48. On or about February 9, 2018, almost assuredly after she read the letter from Attorney McGill, Ms. Junco e-mailed Plaintiff, in which e-mail Junco threatened to suspend her benefits entirely until Plaintiff spoke with Junco, speciously claimed that Plaintiff had been uncooperative, and re-stated her opinion that Plaintiff only had osteophytes on her cervical spine.

49. On or about February 14, 2018, respectively, Plaintiff received another e-mail from Ms. Junco, in which Junco stated Plaintiff's maintenance and cure benefits were being suspended for the false reason that Plaintiff did not cooperate with Junco.

50. Junco also blocked Plaintiff from paying for Plaintiff's COBRA insurance via internet as Plaintiff had successfully done for many months prior. Plaintiff had to mail in the check which was not credited to Plaintiff's account until the last day on which payment could be made to

keep Plaintiff's insurance in force.

51. Also on or about February 14, 2017, Plaintiff responded to Junco's last e-mail and stated that she (Plaintiff) would no longer be speaking to her (Junco) and that Junco should speaking with Plaintiff's attorney, McGill. And Plaintiff attached a copy of the aforesaid letter which McGill had previously sent Junco.

52. Mr. McGill did on one occasion in March 2018 speak with Junco who asked him to send Plaintiff's doctor's reports, which reports Junco, of course, already had.

53. Plaintiff heard nothing from or about Junco or maintenance and cure since that time. Defendant has not made provision to Plaintiff of any maintenance since on or about March 20, 2018. And Defendant has not made provision of any of the prescribed, curative physical therapy.

## COUNT I
## JONES ACT NEGLIGENCE – FAILURE TO PROVIDE PROMPT AND ADEQUATE MAINTENANCE AND CURE

54. Plaintiff adopts and re-alleges paragraphs 1 through 53 as if fully set forth herein, and further alleges:

55. Plaintiff, as a seaman, is entitled to recover maintenance and cure from Defendant until she is declared to have reached maximum possible cure.

56. Maintenance and cure provides a seaman, who is injured or ill while in the service of the vessel, medical care and treatment, and the means of maintaining him or herself, while recuperating.

57. From the earliest times, maritime nations have recognized that unique hazards, emphasized by unusual tenure and control, attend the work of seamen. The physical risks created by natural elements and the limitations of human adaptability to work at sea enlarge the narrower and

more strictly occupational hazards of sailing and operating vessels. And the restrictions which accompany living aboard ship for long periods at a time combine with the constant shuttling between unfamiliar ports to deprive the seaman of the comforts and opportunities for leisure, essential for living and working, that accompany most land occupations. Furthermore, the seaman's unusual subjection to authority adds the weight of what would be involuntary servitude for others to these extraordinary hazards and limitations of ship life.

58. Accordingly, with the combined object of encouraging marine commerce and assuring the well-being of seamen, maritime nations uniformly have imposed broad responsibilities for their health and safety upon Jones Act employers, such as the Defendant.

59. Among the most pervasive incidents of the responsibility anciently imposed upon a Jones Act employer for the health and security of sailors, was liability for the maintenance and cure of seamen becoming ill or injured during the period of their service. In the United States, this obligation has been recognized consistently as an implied provision in contracts of maritime employment. Created thus with the contract of employment, the liability in no sense is predicated on the fault or negligence of the employer, like the Defendant.

60. A seaman, like Plaintiff, is entitled to maintenance and cure until he or she reaches maximum possible cure, irrespective of whether the illness or injuries were received by negligence or accident.

61. Plaintiff in this case was, as indicated previously, "in the service of the ship" when she suffered her injury.

62. Consequently, she has a right to receive maintenance and cure until maximum possible cure.

63. At all times material, Defendant was a Jones Act Employer and had a fundamental absolute and non-delegable duty under the Jones Act to make provision to Plaintiff of prompt and

adequate maintenance and cure in a non-negligent manner.

64. Defendant is liable under the Jones Act in damages for harm resulting in whole or in part from the negligent failure of its officers, agents, or employees to make provision of prompt and adequate maintenance and cure. A simple showing of some negligence on the part of the employer which played any part, even the slightest, in producing harm to the Plaintiff, creates a jury question on the issue of negligence.

65. An employer, like the Defendant, is liable if it fails to provide or pay a seaman prompt and adequate maintenance or fails to provide prompt and adequate cure.

66. An employer, like the Defendant, is liable for even greater damages if its failure to provide or pay a seaman prompt and adequate maintenance or failure to provide prompt and adequate cure is willful, arbitrary, capricious, and in callous disregard of the rights of a seaman.

67. Here, Defendant paid Plaintiff a paltry $25 per day in maintenance in putative reliance on a provision in the contract of adhesion employment agreement Defendant furnished Plaintiff, even though Defendant had actual or constructive knowledge that $25 per day was an insufficient maintenance amount for Plaintiff. And Defendant never advised Plaintiff that she had a right to a higher maintenance amount notwithstanding the provision in the agreement. Defendant's failures to pay Plaintiff a higher maintenance amount and to advise Plaintiff of her entitlement to a higher amount were negligent or willful, arbitrary, capricious, and in callous disregard of the rights of Plaintiff

68. Additionally or alternatively, Defendant delaying making provision of cure on repeated occasions, as previously alleged. One or more of Defendant's delays were negligent or willful, arbitrary, capricious, and in callous disregard of the rights of Plaintiff.

69. Additionally or alternatively, Defendant failed to make provision of other aspects of cure, to

wit: failed to reimburse Plaintiff her mileage for trips to and from health care providers; failed to reimburse Plaintiff out of pocket medical expenses such as prescription and over the counter medications; and/or failed to reimburse Plaintiff her share of health insurance premiums and COBRA payments. Defendant's failure(s) was/were negligent or willful, arbitrary, capricious, and in callous disregard of the rights of Plaintiff.

70. Additionally or alternatively, Defendant ceased making provision of both maintenance and cure, despite the fact Plaintiff had not been declared at maximum medical cure, and Defendant's cessation was negligent or willful, arbitrary, capricious, and in callous disregard of the rights of Plaintiff.

71. Defendant's agent in charge of the provision of maintenance and cure, Elizabeth Junco, of Steiner Transocean Ltd, located in Coral Gables, Florida, is notorious for failing to make provision of prompt and adequate maintenance and cure. Indeed, undersigned counsel has alone sued multiple times over the last 10 years for Junco's willful violations maintenance and cure law.

72. As a direct and proximate result, Plaintiff suffered harm, including, without limitation, bodily injury, pain and suffering, disability, disfigurement, emotional distress, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and/or nursing care and/or treatment, loss of earnings, loss of ability to earn money and/or aggravation of a previously existing condition. One or more of the losses are permanent and/or continuing, and Plaintiff will suffer the loss(es) in the future.

73. WHEREFORE, the Plaintiff demands judgment under the Jones Act against the Defendant, MANDARA SPA (HAWAII), LLC, together with any and all compensatory damages, punitive damages, attorney's fees, statutory interest as permitted, pre-judgment interest as

permitted, costs as permitted, trial by jury for all issues so triable, and any other relief that this Court deems proper.

## COUNT II
## U.S. GENERAL MARITIME LAW CLAIM FOR FAILURE TO PROVIDE PROMPT AND ADEQUATE MAINTENANCE AND CURE

74. Plaintiff adopts and re-alleges paragraphs 1 through 53 as if fully set forth herein, and further alleges:

75. Under the U.S. General Maritime Law, Plaintiff, as a seaman, is entitled to recover maintenance and cure from Defendant until she is declared to have reached maximum possible cure.

76. Maintenance and cure provides a seaman, who is injured or ill while in the service of the vessel, medical care and treatment, and the means of maintaining him or herself, while recuperating.

77. From the earliest times, maritime nations have recognized that unique hazards, emphasized by unusual tenure and control, attend the work of seamen. The physical risks created by natural elements and the limitations of human adaptability to work at sea enlarge the narrower and more strictly occupational hazards of sailing and operating vessels. And the restrictions which accompany living aboard ship for long periods at a time combine with the constant shuttling between unfamiliar ports to deprive the seaman of the comforts and opportunities for leisure, essential for living and working, that accompany most land occupations. Furthermore, the seaman's unusual subjection to authority adds the weight of what would be involuntary servitude for others to these extraordinary hazards and limitations of ship life.

78. Accordingly, with the combined object of encouraging marine commerce and assuring the

well-being of seamen, maritime nations uniformly have imposed broad responsibilities for their health and safety upon employers, such as the Defendant.

79. Among the most pervasive incidents of the responsibility anciently imposed upon an employer for the health and security of sailors, was liability for the maintenance and cure of seamen becoming ill or injured during the period of their service. In the United States, this obligation has been recognized consistently as an implied provision in contracts of maritime employment. Created thus with the contract of employment, the liability in no sense is predicated on the fault or negligence of the employer, like the Defendant.

80. A seaman, like Plaintiff, is entitled to maintenance and cure until he or she reaches maximum possible cure, irrespective of whether the illness or injuries were received by negligence or accident.

81. Plaintiff in this case was, as indicated previously, "in the service of the ship" when she suffered her injury.

82. Consequently, she has a right to receive maintenance and cure until maximum possible cure.

83. At all times material, Defendant had a fundamental absolute and non-delegable duty under the U.S. General Maritime Law to make provision to Plaintiff of prompt and adequate maintenance and cure in a non-negligent manner.

84. Defendant is liable under the U.S. General Maritime Law in damages for harm resulting in whole or in part from the negligent failure of its officers, agents, or employees to make provision of prompt and adequate maintenance and cure.

85. An employer, like the Defendant, is liable if it fails to provide or pay a seaman prompt and adequate maintenance or fails to provide prompt and adequate cure.

86. An employer, like the Defendant, is liable for even greater damages if its failure to provide or

pay a seaman prompt and adequate maintenance or failure to provide prompt and adequate cure is willful, arbitrary, capricious, and in callous disregard of the rights of a seaman.

87. Here, Defendant paid Plaintiff a paltry $25 per day in maintenance in putative reliance on a provision in the contract of adhesion employment agreement Defendant furnished Plaintiff, even though Defendant had actual or constructive knowledge that $25 per day was an insufficient maintenance amount for Plaintiff. And Defendant never advised Plaintiff that she had a right to a higher maintenance amount notwithstanding the provision in the agreement. Defendant's failures to pay Plaintiff a higher maintenance amount and to advise Plaintiff of her entitlement to a higher amount were negligent or willful, arbitrary, capricious, and in callous disregard of the rights of Plaintiff

88. Additionally or alternatively, Defendant delaying making provision of cure on repeated occasions, as previously alleged. One or more of Defendant's delays were negligent or willful, arbitrary, capricious, and in callous disregard of the rights of Plaintiff.

89. Additionally or alternatively, Defendant failed to make provision of other aspects of cure, to wit: failed to reimburse Plaintiff her mileage for trips to and from health care providers; failed to reimburse Plaintiff out of pocket medical expenses such as prescription and over the counter medications; and/or failed to reimburse Plaintiff her share of health insurance premiums and COBRA payments. Defendant's failure(s) was/were negligent or willful, arbitrary, capricious, and in callous disregard of the rights of Plaintiff.

90. Additionally or alternatively, Defendant ceased making provision of both maintenance and cure, despite the fact Plaintiff had not been declared at maximum medical cure, and Defendant's cessation was negligent or willful, arbitrary, capricious, and in callous disregard of the rights of Plaintiff.

91. Defendant's agent in charge of the provision of maintenance and cure, Elizabeth Junco, of Steiner Transocean Ltd, located in Coral Gables, Florida, is notorious for failing to make provision of prompt and adequate maintenance and cure. Indeed, undersigned counsel has alone sued multiple times over the last 10 years for Junco's willful violations maintenance and cure law.

92. As a direct and proximate result, Plaintiff suffered harm, including, without limitation, bodily injury, pain and suffering, disability, disfigurement, emotional distress, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and/or nursing care and/or treatment, loss of earnings, loss of ability to earn money and/or aggravation of a previously existing condition. One or more of the losses are permanent and/or continuing, and Plaintiff will suffer the loss(es) in the future.

93. WHEREFORE, the Plaintiff demands judgment under the General Maritime Law against the Defendant, MANDARA SPA (HAWAII), LLC, together with any and all compensatory damages, punitive damages, attorney's fees, statutory interest as permitted, pre-judgment interest as permitted, costs as permitted, trial by jury for all issues so triable, and any other relief that this Court deems proper.

Respectfully submitted,

**BRILL & RINALDI, THE LAW FIRM**
Attorneys for Plaintiff
17150 Royal Palm Blvd., Suite 2
Weston, Florida 33326
Telephone: (954) 876-4344
Facsimile: (954) 384-6226
**David W. Brill, Esq.**
Florida Bar No. 0959560
Primary e-mail: david@brillrinaldi.com
Secondary e-mail: yamile@brillrinaldi.com
**Joseph J. Rinaldi, Jr., Esq.**
Florida Bar No. 0581941

Primary e-mail: joe@brillrinaldi.com
Secondary e-mail: yamile@brillrinaldi.com
**Michelle Y. Gurian, Esq.**
Florida Bar No. 100312
Primary email: michelle@brillrinaldi.com
Secondary e-mail: yamile@brillrinaldi.com

s/ *David W. Brill*
**David W. Brill, Esq.**